UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES

       -against-                               24 CR 670 (LJL)


JONATHAN LOADHOLT

--------------------------------------------------------x


## JONATHAN LOADHOLT'S
## SENTENCING MEMORANDUM


Deborah Colson
Moskowitz Colson Ginsberg & Schulman
One Battery Park Plaza, 31st Floor
New York, N.Y. 10004

Joshua Lax
Law Office of Joshua J. Lax
225 Broadway, Suite 715
New York, N.Y. 10007

*Attorneys for Jonathan Loadholt*

**Table of Contents**

I. INTRODUCTION ............................................................................................................... 1

II. PERSONAL HISTORY ..................................................................................................... 2

III. NATURE AND CIRCUMSTANCES OF THE OFFENSE ........................................... 5

IV. OBJECTIONS TO THE PRESENTENCE REPORT ..................................................... 7

V. THE SENTENCING GUIDELINES ................................................................................. 9

VI. MR. LOADHOLT MERITS A SENTENCE BELOW PROBATION'S

RECOMMENDATON OF SIX YEARS ............................................................................. 12

VII. CONCLUSION ............................................................................................................. 16

## Table of Authorities

**Cases**

*Gall v. United States*, 128 S.Ct. 586 (2007)........................................................... 12, 13, 16

*Koon v. United States*, 518 U.S. 81 (1996) ...................................................................... 12

*Pepper v. United States*, 131 S.Ct. 1229 (2011)............................................................. 12

*United States v. Amirov*, 22 Cr. 438 (S.D.N.Y Feb. 28, 2025)................................... 13, 14

*United States v. Ovid*, 09 Cr. 216, 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010)........................... 16

**Statutes**

18 U.S.C. § 3551(a) ........................................................................................................ 12

18 U.S.C. § 3553(a) ..................................................................................................... 8, 12

**Other Authorities**

Kristin Turney and Rebecca Goodsell, The Future of Children, *Parental Incarceration and Children's Wellbeing,* Vol. 28, No. 1 (Spring 2018)........................................................ 15

National Institute of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* (May 2016). 16

Psychology Today, *Harsh Justice* (Sept. 13, 2015) ........................................................ 15

The Osborne Association, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents* (May 2011) .......................................................................................................... 15

U.S.S.C, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) ........................... 14

Vera Institute of Justice, *A New Paradigm for Sentencing in the United States* (Feb. 2023) ....... 15

**I.**

**INTRODUCTION**

In July 2024, Mr. Loadholt got his dream job working as a bus driver for the MTA. He had spent years driving an oil delivery truck, but the long hours and constant travel had become difficult now that he and his girlfriend Tantiqua Lilley had a six-month-old baby at home. The MTA position promised stability, predictability and a life built around the people he loved. Mr. Loadholt began work in July 2024 after passing written and practical exams. Months later, a reckless and senseless decision made at the behest of a friend cost him his job, his freedom, and years with his family he will never get back.

The Probation Department recommends a sentence of six years, but just punishment requires a sentence far below Probation's recommendation. Mr. Loadholt played a lesser role in the offense than his co-defendant Carlisle Rivera, who planned the scheme, recruited Mr. Loadholt and served as the conduit for communications with a third co-conspirator, Farhad Shakeri. Mr. Loadholt is also highly unlikely to reoffend. Prior to this case, he had not been arrested in sixteen years. His criminal history is minor compared to Rivera's, who has a prior second-degree murder conviction. And most importantly, Mr. Loadholt is humbled and humiliated by his offense and eager to make amends. *See* Ex. A (Jonathan Loadholt letter). While at the MDC, he has been taking classes, addressing his mental health, and reflecting on his wrongdoing. His family is his primary concern, and he understands that any additional misconduct could jeopardize his most precious relationships.

1

## II.

## PERSONAL HISTORY

Mr. Loadholt's early life was shaped by two devastating losses, the death of his baby brothers when he was six, and the death of his mother from cancer when he was seventeen. Both events profoundly impacted Mr. Loadholt's sense of safety and well-being at critical stages of his development.

Mr. Loadholt was raised by his mother, Shawnte Loadholt in Brooklyn, New York. His parents never married and their relationship ended when he was still a baby. PSR ¶ 109. Mr. Loadholt's mother worked at a daycare and eventually returned to school to become a registered nurse. *Id.* at ¶ 107. His father, who worked as a security guard, remained largely absent and failed to provide Mr. Loadholt or his mother with any meaningful financial support. *Id.* at ¶ 109.

When Mr. Loadholt was four or five, his mother began a relationship with a man named Philip Benjamin. PSR ¶ 109. Over the course of their relationship, Benjamin was both physically and verbally abusive. *Id.* Mr. Loadholt's mother repeatedly called the police and obtained multiple orders of protection against him, *id.,* but he kept coming back. The two lived together on and off for about ten years.

Mr. Loadholt was six when his mother became pregnant with twin boys. Shortly before the boys' birth, she and Benjamin got into an argument, which quickly escalated into a physical fight. PSR ¶ 109. Mr. Loadholt woke early one morning to find Benjamin pressing a knife against his mother's pregnant stomach. *Id.* The twins were delivered prematurely a few weeks later, and both died in infancy. *See* Ex. B (Diana Ayala letter).

After the twins died, Mr. Loadholt's mother fell into a deep depression, shutting herself in their apartment and refusing to allow visitors. Mr. Loadholt was sent to stay with his aunt. While

2

he cannot recall much from those months, the fear and confusion he experienced is still lodged deep inside him. When he eventually returned to his mother's home, she did her best to care for him, but she blamed herself for her sons' death, and he believes she never fully recovered from their loss.

Mr. Loadholt was a strong student in elementary school, but things changed when he began middle school in a new neighborhood and found himself on the wrong side of a longstanding neighborhood rivalry. Several older students singled him out because of where he lived, and they bullied him for months before his mother got him a safety transfer to a new school.

Being uprooted twice in a year proved incredibly destabilizing for Mr. Loadholt. His academic focus slipped and with it, his confidence in himself as a student. He began skipping school on a regular basis, then left altogether toward the end of eighth grade. PSR ¶ 126.  At his mother's urging, he took high school courses online the following fall but had trouble concentrating in a remote setting. After finishing the ninth grade, he dropped out for good.

Shortly after Mr. Loadholt left school, his mother was diagnosed with stomach cancer. PSR ¶ 107. She kept her illness from him for about a year until he overheard her discussing it with a friend. She got chemotherapy and briefly went into remission, but the cancer quickly returned. This time around, Mr. Loadholt knew that his mother was very ill. Still, he had no idea that she was dying until a few months before she passed.

Mr. Loadholt was just seventeen when he lost his mother, and her death was both shocking and devastating. He was not ready to face the world alone. For the first year, he stayed in his mother's apartment, looking for work and spending down the savings she had left him. Eventually, however, he was evicted from the apartment because his name was not on the lease.

After the eviction, Mr. Loadholt moved in with his maternal grandmother, Diana Ayala. "I tried to help as best I could," writes Ms. Ayala. Ex. B. "We got along well. He treated me with respect and helped around the house when I asked." *Id.* Yet, while Mr. Loadholt appreciated his grandmother's care and attention, no bond could replace the one he had lost.

Over the next few years, Mr. Loadholt became increasingly adrift. He tried returning to school to study auto-mechanics but was too distracted to complete the program. He began spending time on the streets instead, drinking and hanging out with a new crowd. His new friends were a bad influence on him, and he made some poor choices he later came to regret. In 2007, at age eighteen, Mr. Loadholt participated in a street-level robbery with friends for which he served three months on Rikers Island. PSR ¶ 99. Just a few months after his release, he was arrested again for stealing a motorcycle. *Id.* at ¶ 98. His second case dragged on for several years and by the time he was sentenced, he was twenty-two years old. The judge allowed him to serve his sentence on weekends so he could participate in an autobody course during the weekdays. Throughout the many long weekends Mr. Loadholt spent on Rikers, he resolved to turn his life around and to re-commit to his relationship with his girlfriend, Tantiqua Lilley.

When Mr. Loadholt's sentence was complete, he moved in with Tantiqua and her mother, then set about looking for work. He had never held a full-time job and was afraid that no one would hire him because of his record, but Tantiqua encouraged him to apply widely. After dozens of rejections, the owner of Jet's Towing Company in Brooklyn finally gave him a chance. He stayed with the company for more than a year.

After leaving Jet's, Mr. Loadholt took any job he could get. He worked at Door Dash, then Family Dollar, and eventually as a driver for two busing companies, North Fork Express and Best Trails & Travel. PSR ¶ 132. In 2017, he got his best job yet, delivering fuel to

4

commercial and residential buildings in New York, New Jersey and Connecticut. *Id.* at ¶ 133. All the while, he remained committed to Tantiqua and helped to support her and her family. He also provided financial assistance to his daughter, ███████ from another relationship. *Id.* at § 112. ███████ (now age six) lives with her mother, but Mr. Loadholt has played an active role in her upbringing. *Id.*

Tantiqua got pregnant in 2023, and she and Mr. Loadholt began making plans to get married and move into an apartment of their own. Their son, ███████ was born in early 2024. A few months later, Mr. Loadholt landed a great job working for the MTA. PSR ¶ 130. After years on the road, the MTA position promised predictable hours, good benefits, and more time at home with his family. Tragically, a deeply misguided decision to help his friend Carlisle Rivera cost him everything he had worked so hard to achieve.

### III.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

On January 15, 2026, Mr. Loadholt pled guilty to stalking and conspiracy to commit money laundering in connection with a scheme to locate an Iranian-American activist living in New York. Mr. Loadholt was drawn into the scheme by his friend, Carlisle Rivera. Rivera was acting at the direction of a third co-defendant, Farhad Shakeri, who he knew from prison. According to the government, Shakeri is an Afghan national and an asset of the Islamic Revolutionary Guard Corps (IRGC).

In early 2024, Rivera told Mr. Loadholt that a friend of his from prison, who was now living overseas, was looking for his wife in the United States. (Rivera had referenced his time in prison before but had never mentioned a murder conviction). According to Rivera, his friend's wife had run off with the couple's child and hundreds of thousands of dollars in cash. Mr.

Loadholt agreed to help search for the woman without knowing anything about her. He had no idea that she was a political activist or a target of the IRGC. Mr. Loadholt does not have strong political beliefs and is not well-versed in international affairs. Prior to his arrest, he did not even know what the IRGC was.

Mr. Loadholt never met or spoke to Shakeri; they had no contact of any kind. In fact, Rivera told Shakeri that he had intentionally kept the two men apart. "[T]he less he [Loadholt] knows, the better off you are," Rivera explained. "The less you know, the better off he is. Only thing y'all knew each other is through me." PSR § 53.

Shakeri's directives reached Mr. Loadholt through Rivera. Mr. Loadholt maintains that Rivera never asked him to commit murder, and the text records bear this out: there are *no* references to murder or violence of any kind in Rivera's many text exchanges with Mr. Loadholt during this period. Nor was Mr. Loadholt present when Rivera discussed details of the murder plot with Shakeri. The PSR mistakenly states that Rivera and Shakeri exchanged various voice notes about the plot on March 31, 2024, while Rivera and Mr. Loadholt "were surveilling the Brooklyn Residence." PSR ¶ 52. In fact, Rivera sent the voice notes later in the day—hours after his surveillance with Mr. Loadholt had concluded—and there is no evidence that he and Mr. Loadholt were together at the time. Even so, Mr. Loadholt clearly understood the potential for serious violence. At one point, Rivera told him that he intended to buy a gun.

Mr. Loadholt drove Rivera to look for the woman on various occasions in February and March 2024. Once they went to a university campus in Connecticut. After that, they drove to a house in Brooklyn where Rivera thought she lived. Sometime during this period, Shakeri wired Rivera several thousand dollars. Rivera told Mr. Loadholt that he was going to spend part of the

money on gas and food and part of it on a gun. If any money remained, Rivera kept it for himself.

Mr. Loadholt's took his last trip to Brooklyn with Rivera in late March. Their plan stalled after that. Rivera continued to stay in contact with Shakeri for several more months, periodically relaying updates to Mr. Loadholt. According to Rivera, Shakeri promised to pay them $100,000 with $10,000 to be delivered "up front." But the money never came. In mid-July, Loadholt expressed his frustration to Rivera over the delay in payment, writing: "So no 10 up front, I'm guessing?? I'm screaming my head off ryt now … I'm so frustrated son I'm like ready to jump out the window." PSR § 62. Shortly thereafter, both men concluded they had been duped, and they abandoned the plan for good. They were arrested three months later, on November 7, 2024.

Mr. Loadholt is deeply ashamed of his role in the offense and for the senseless decisions he made. "I pled guilty because what I did was wrong," he writes, "and I take full responsibility." Ex. A. "I made a wrong decision in this case, [and] I not only hurt myself, I hurt my family and had an affect on the feelings and comfort of a victim I don't even know." *Id.* Tantiqua visits Mr. Loadholt at the MDC regularly and writes that she "can seen the change in him mentally and spiritually." Ex. C (Tantiqua Lilley letter). He is "very remorseful of the whole situation," she explains, and has gone "from blaming to accepting his role and wrongdoings in this case." *Id.*

**IV.**

**OBJECTIONS TO THE PRESENTENCE REPORT**

Our objections to the Presentence Report follow below.

Paragraphs 6-10: Paragraphs 6 through 10 should be deleted in their entirety. The discussion of "related cases" contained in these paragraphs has no bearing on Mr. Loadholt's personal history, characteristics, or role in the offense, and therefore contributes nothing to the

7

Court's individualized assessment under 18 U.S.C. § 3553(a). It merely invites the Court to view Mr. Loadholt's conduct through the lens of other cases rather than on its own terms.

Paragraph 21: The words "and Loadholt" should be deleted from the last sentence of the paragraph. Assuming a "Shakeri Network" existed, Mr. Loadholt was not part of it. The two men never met, never spoke over the phone, and never communicated through text or email. Nor did the IRGC task Shakeri with using Mr. Loadholt to surveil and kill Victim-1. In fact, there is no evidence that the IRGC knew Mr. Loadholt's name or was even aware of his existence. Thus, including Mr. Loadholt as part of the "Shakeri Network" implies a level of culpability the record does not support.

Paragraph 52: The phrase "while Rivera and Loadholt were surveilling the Brooklyn Residence" should be deleted from the second sentence of the paragraph. The current phrasing improperly suggests that Rivera and Loadholt were together when Rivera messaged Shakeri. Rivera exchanged several voice notes with Shakeri *on the same day* that he and Loadholt surveilled the house in Brooklyn but not during the surveillance itself. The time stamps on the voice notes indicate they were sent on the night of March 31, 2024—hours after Rivera and Mr. Loadholt completed their surveillance—and there is no evidence to suggest the two men were together at the time.

Paragraph 58: Mr. Loadholt's name should be deleted from the phrase "Shakeri's failure to disclose information about Rivera and Loadholt." There is no evidence that Shakeri knew Mr. Loadholt's name or had other material information about him.

Paragraph 71: The last sentence of the paragraph should be changed to accurately reflect Shakeri's statement about Rivera's associate during his November 7, 2024, interview with the FBI. When asked if anyone aside from Rivera was involved, Shakeri stated: "There was one

8

person that Carlisle used *for the surveillance purpose,* but I don't know his name." (emphasis added). In light of Shakeri's statement, indicating that Mr. Loadholt's participation was limited to surveillance, "who was working with Rivera" should be replaced with "who he used for surveillance purposes."

Paragraphs 72-75: Paragraphs 72 through 75 should be deleted in their entirety. The matters discussed have no bearing on the guidelines calculation, § 3553 factors, or any legitimate sentencing consideration.

Paragraph 76: Mr. Loadholt's name should be deleted from the phrase "Shakeri had directed his criminal associates, including Rivera and Loadholt…." Mr. Loadholt was not Shakeri's associate. There is no evidence that the two men ever communicated or that Shakeri even knew Mr. Loadholt's name.

Paragraph 77: The phrase "in order to purchase" should be changed to "in order for Rivera to purchase." There is no evidence that Mr. Loadholt purchased or planned to purchase a firearm.

## V.

## THE SENTENCING GUIDELINES

Mr. Loadholt pleaded guilty, pursuant to a plea agreement, to a two-count information charging stalking and conspiracy to commit money laundering. The plea agreement does not require Mr. Loadholt to stipulate to the government's estimated guidelines calculation. It specifically states that he may argue that an alternative calculation applies.

The parties agree that the stalking and money laundering offenses are grouped for guidelines calculation purposes because they involve the same victim and at least two acts or transactions connected by a common scheme or plan. U.S.S.G. § 3D1.2(b). Under the grouping

rules, the offense level applicable to the group is the highest level for the most serious count comprising the group. *See* U.S.S.G. § 3D1.3(a).

The Probation Department applies the stalking guideline, § 2A6.2, which includes a cross reference where the offense involved the commission of another crime, and the guideline for the other crime is greater than the stalking guideline. *See* U.S.S.G. § 2A6.2(c)(1). According to Probation, because Mr. Loadholt's stalking offense involved the commission of a conspiracy to commit murder-for-hire, the applicable guideline is the murder-for-hire guideline, § 2E1.4(a)(2). Pursuant to § 2E1.4(a)(2), the Court must apply the offense level for the underlying unlawful conduct if that level exceeds 32. Probation applies the guideline for conspiracy to commit murder, § 2A1.5(a), which results in an offense level of 33.

Probation errs in applying Guidelines § 2E1.4(a)(2) and § 2A1.5 to this case. While the indictment included a murder-for-hire count, that is not Mr. Loadholt's offense of conviction. Following extensive discussions with the assigned prosecutors, the government made a considered decision to offer Mr. Loadholt a plea to a two-count information charging stalking and money laundering. Probation's use of § 2E1.4(a)(2) and § 2A1.5 disregards the offense structure that the parties negotiated and the Court accepted.

The correct guideline for calculation purposes is the money laundering guideline, § 2S1.1. The grouping rules require application of § 2S1.1 because the offense level for money laundering is higher than the offense level for stalking. The cross reference in the stalking guideline, § 2A6.2, also supports the application of § 2S1.1 because Mr. Loadholt's stalking offense involved the commission of money laundering. *See* U.S.S.G. § 2A6.2(c).

Section 2S1.1(a) provides that the base offense level for money laundering is:

(1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense . . .; and (B) the offense level for that offense can be determined; or

(2) 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

The laundered funds in this case represent money paid in order to induce the defendants to commit the crime of stalking. Dkt No. 64 (transcript of guilty plea) at 32:24-25 – 33:1-2 (THE DEFENDANT: Your Honor, I understood that the money that was to be received *was payment for the surveillance*, and that some money would be used by a co-conspirator to illegally purchase a firearm.") (emphasis added). Money paid to induce someone to commit a crime is not "derived from" the crime. Rather, it is paid in exchange for commission of the crime. Thus, §2S1.1(a)(2) applies.

Under § 2S1.1(a)(2), the base offense level is 8 plus the number of offense levels from the table in § 2B1.1, corresponding to the value of laundered funds. Here, another 8 levels are added under § 2B1.1 because the defendants conspired to launder $100,000.[1] Section 2S1.1(b)(1) requires an additional 6-level increase because Mr. Loadholt knew that the laundered funds were intended to promote an offense involving firearms, resulting in offense level 24. After a 3-level acceptance of responsibility reduction, the total offense level is 21. Because Mr. Loadholt is in criminal history category 1, his advisory guidelines range is 37 to 46 months.

---

[1] Notably, under the amended Sentencing Guidelines, effective November 1, 2026, only 6 levels would be added under § 2B1.1.

## VI.

### MR. LOADHOLT MERITS A SENTENCE BELOW
### PROBATION'S RECOMMENDATON OF SIX YEARS

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection."  18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under Section 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence of criminal conduct; (C) to protect the public from future crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Pepper*, 131 S.Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007). Rather, the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id.* at 597.

Multiple factors support a sentence below six years.

First, Mr. Loadholt played a lesser role in the offense than Rivera, who planned the scheme, recruited Mr. Loadholt, and communicated with Farhad Shakeri. *See* PSR, Sentencing Recommendation, p. 49 ("Loadholt appears to have been comparatively less culpable, whereby he was recruited to participate in the offense by co-defendant, Carlisle Rivera, who had a pre-existing relationship with Shakeri and served as his main point of contact"). Mr. Loadholt's criminal record is also much less serious than Rivera's. Rivera has a prior murder conviction for which he served eighteen years in prison. Mr. Loadholt has never spent more than six months in jail, and it has now been eighteen years since his last arrest. *See id.*

Second, each of the two counts of conviction carries a statutory maximum sentence of five years—a full year below Probation's recommended sentence of six years. Of course, the Court could impose consecutive sentences, but Judge McMahon's decision in *United States v. Amirov* counsels otherwise. *Amirov* involved a 2022 murder-for-hire plot against the same victim targeted in this case. The defendants proceeded to trial and were convicted of four offenses: (1) conspiracy to commit murder-for-hire, (2) conspiracy to commit money laundering, (3) attempted murder in aid of racketeering, and (4) possession of a firearm during and in relation to a crime of violence. Judge McMahon decided to impose concurrent sentences because the counts of conviction arose from the same conduct. *See* 22 Cr. 438 (CM), Dkt No. 163 at 7 (explaining that "[c]oncurrent sentences are commonly imposed, by this court, in this district, and elsewhere, when multiple counts of conviction arise from the same conduct."). The same logic applies here. As in *Amirov*, "the money that was laundered was paid to get the defendants to commit" the other offense of conviction, namely the stalking. *Id.* at 8. "[T]he sentence on the money laundering count should" therefore "run concurrently with the sentenc[e]" on the stalking count. *Id.*

13

Third, Mr. Loadholt does not pose a risk of future danger to his community. He has a supportive partner in Tantiqua as well as two young children to support. He also has a lengthy work history, *see* PSR at p. 48, a strong work ethic, and a plan for his professional future, including restarting his trucking company and returning to the MTA, *see* Ex. A. He has shown that he is capable of reform by spending his time at the MDC productively, studying for his GED, taking various life skills classes, and addressing his mental health. *See* PSR §§ 14, 119, Ex. D (MDC certificates). "[A]s part of my rehabilitation, with no excuses[,] I took all of my anger toward myself and put that energy into any program that will benefit me and my family upon my release," he writes. Ex. A. "I am terrified and definitely won't fall into any more trouble to be back before you." *Id.* Finally, whatever sentence Mr. Loadholt receives, he will be near 40 or in his 40s when he is released, and studies show that the chance of recidivism decreases in middle age. *See* U.S.S.C, *The Effects of Aging on Recidivism Among Federal Offenders*, at 11, Fig. 1 (2017).

Fourth, Mr. Loadholt's family needs his financial and emotional support. Prior to his arrest, Mr. Loadholt was the primary breadwinner in his family. Tantiqua works as a part-time home health aide, but she earns just $1800 a month, barely enough to cover basic necessities. She is struggling to pay for food, transportation, clothing and other household items, PSR ¶ 114, and the burden on her will escalate with time. ███ was just six months old when his father was arrested and had limited financial needs, but his needs will increase as he grows older and enters school. He was recently diagnosed with cognitive, adaptive, social and communication delays, *id* at ¶ 111, and managing those conditions is likely to require costly, long-term care. Tantiqua is not equipped to face those challenges alone.

Beyond the economic hardships a lengthy prison sentence would create, it goes without saying that Mr. Loadholt's extended absence would exact a significant emotional price on ███.

"[P]arental incarceration is now recognized as an 'adverse childhood experience' (ACE) of the type that can significantly increase the likelihood of long-term negative outcomes for children." The Osborne Association, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents*, at 12 (May 2011); *see id.* ("[R]esearch suggests that parental imprisonment more often intensifies and compounds, rather than alleviates, the challenges children face."). Indeed, "[c]ompared to other children, those who experience parental incarceration suffer impairments across four domains of wellbeing: behavior, education, health, and hardship and deprivation." Kristin Turney and Rebecca Goodsell, The Future of Children, *Parental Incarceration and Children's Wellbeing*, Vol. 28, No. 1, at 148 (Spring 2018). Mr. Loadholt's father was a sporadic presence in his childhood. He does not want to repeat that pattern with ▮▮▮. This factor alone warrants the Court's serious consideration.

Finally, a lengthy sentence is not necessary to promote general deterrence. Numerous studies have found that there is little correlation between sentence length and general deterrence, partly because many would-be criminals do not expect to get caught. In a recent report, the Vera Institute of Justice explained that "people do not order their unlawful behavior around the harshness of sentences they may face, but around their perceived likelihood of being caught and facing any sentence." Vera Institute of Justice, *A New Paradigm for Sentencing in the United States*, at 23 (Feb. 2023) (emphasis in original). Similarly, a 2014 study by the National Research Council found that "the incremental deterrent effect of increases in lengthy prison sentences is modest at best." Psychology Today, *Harsh Justice* (Sept. 13, 2015) (citing National Research Council report). Even the National Institute of Justice—a research agency of the Department of Justice—has found that "the chance of being caught is a vastly more effective deterrent than even

draconian punishment." National Institute of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* (May 2016).

In its sentencing memorandum for Rivera, the government wrote that "[a] strong sentence is needed here to send the message to criminal networks—and to individual criminals, like Rivera—that working with the Iranian regime is a path to a lengthy incarceration." Dkt. No. 55 at 18. Rivera's sentence—along with those imposed for similar plots—now sends a clear message to anyone who might consider aligning with the Iranian regime. No reasonable person observing Rivera's sentence could expect leniency, regardless of what sentence the Court imposes here.

The advisory guidelines permit judges to make an "individualized assessment" of the sentenced warranted "based on the fact presented." *Gall*, 128 S.Ct. at 597; *see also United States v. Ovid*, 09 Cr. 216, 2010 WL 3940724, at *8 (E.D.N.Y. Oct. 1, 2010) ("There is nothing surprising or disturbing about the fact that once judgment is allowed to play a role in sentencing, it will be exercised differently by different people. It is the natural consequence of permitting judges to Judge...."). Mr. Loadholt's case is unique, and his sentence should be crafted with his specific circumstances in mind.

## VII.

## CONCLUSION

For the above reasons, the Court should impose a sentence far below Probation's recommended sentence of six years.


May 12, 2026
New York, N.Y.


16