UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        - v. -

JONATHAN LOADHOLT,

                Defendant.

S2 24 Cr. 670 (LJL)

## THE GOVERNMENT'S SENTENCING SUBMISSION

 

JAY CLAYTON
United States Attorney
Southern District of New York

Michael D. Lockard
Jacob H. Gutwillig
Assistant United States Attorneys
   *Of counsel*

**TABLE OF CONTENTS**

Page

BACKGROUND .......................................................................................................................... 2

    I.   The Offense Conduct ................................................................................................... 2

        A. Shakeri Pays Rivera and Loadholt to Target Ms. Alinejad at Fairfield University ......... 3

        B. Rivera and Loadholt Stake Out Ms. Alinejad's Former Residence ............................... 7

        C. Shakeri Prepares $100,000 to Deliver to Rivera if Rivera and Loadholt
           "Finish the Work" ...................................................................................................... 11

        D. Shakeri, Rivera, and Loadholt Discuss the $100,000 Payment to
           "Take Care of It Already" ........................................................................................... 13

        E. Rivera and Loadholt Are Arrested ............................................................................... 15

    II.  The Charges ............................................................................................................... 18

    III. Loadholt's Guilty Plea ............................................................................................... 18

    IV. Rivera's Plea and Sentencing ..................................................................................... 21

    V.  The Presentence Report .............................................................................................. 21

        A. Loadholt's Objections to the PSR ............................................................................... 21

        B. Loadholt's Objections to the Guidelines Calculation .................................................. 25

DISCUSSION ........................................................................................................................... 26

    A.  The Nature and Seriousness of the Offense ................................................................. 26

    B.  The Need to Afford Adequate Deterrence .................................................................... 29

    C.  The History and Characteristics of the Defendant ....................................................... 30

    D.  The Defendant's Sentencing Arguments Do Not Support a Variance ........................... 31

CONCLUSION ......................................................................................................................... 33

The Government respectfully submits the memorandum in advance of the sentencing of defendant Jonathan Loadholt. A sentence of the statutory maximum of 120 months' imprisonment, which is within the Government's and Probation's calculated guidelines range (the "Guidelines Range"), is necessary and appropriate to reflect the grave seriousness of the offense and to afford adequate deterrence to Loadholt and others. Loadholt joined a plot to murder Masih Alinejad, a prominent Iranian-American author, journalist, and human rights advocate living in the United States. The Government of Iran has long sought to murder Ms. Alinejad because of her efforts to promote gender equality and civil liberties in Iran and to expose the regime's corruption, oppression, and terrorism to the international community.

In 2024, Loadholt's friend and co-defendant, Carlisle Rivera, was hired by Rivera's friend, Farhad Shakeri, to murder Ms. Alinejad. Rivera and Shakeri served time together in the New York prison system after Rivera's 1994 murder conviction and Shakeri's 1991 conviction for manslaughter. In 2024, Shakeri was living in Iran and was an asset for the Government of Iran's Islamic Revolutionary Guard Corps ("IRGC"), a designated foreign terrorist organization. The IRGC is a military and intelligence organization that directly reports to the Supreme Leader of the Islamic Republic and is the Government of Iran's primary instrument for providing financial and lethal aid to proxy terror groups in the Middle East. Among its activities, the IRGC plots and conducts attack operations outside Iran targeting, among others, U.S. citizens residing abroad and in the United States. Ms. Alinejad is one of the IRGC's principal targets. The IRGC and the Government of Iran's intelligence services have tried to kidnap or kill Ms. Alinejad themselves, hired organized crime proxies to do so, and, in 2024, turned to the Loadholt and Rivera to kill Ms. Alinejad, a complete stranger to Loadholt and Rivera, in exchange for blood money.

Shakeri offered Rivera $100,000 for he and Loadholt to locate and kill Ms. Alinejad. Loadholt was recruited into the plot by Rivera and, using money sent by Shakeri, Rivera and Loadholt procured a firearm and burner cellphones. Using Loadholt's car and fake license plates, the two men spent several months attempting to find and kill Ms. Alinejad, tracking her down at a public speaking event and repeatedly surveilling the Brooklyn house where Shakeri and the IRGC believed she lived. Fortunately, Ms. Alinejad and her family had moved out of the Brooklyn house and Rivera was unable to find and kill her. Rivera and Loadholt were arrested on November 8, 2024.

In short, Loadholt joined forces with a convicted murderer to attempt to kill Ms. Alinejad in cold blood in New York City, for the price of $100,000. For these reasons, and those discussed more fully below, the Government respectfully submits that the statutory maximum sentence of 120 months' imprisonment is the only appropriate sentence in this case.

## BACKGROUND

**I.      The Offense Conduct**

In 2024, Loadholt was recruited by Rivera to murder Ms. Alinejad. Rivera was tasked by his long-time friend, Shakeri, a former resident of New York with whom Rivera served prison time in the New York State correctional system. Following his prison sentence, Shakeri was deported from the United States and eventually lived in Iran, where the IRGC tasked him to use his international network of criminal associates both to identify targets of interest to the regime and to organize teams to attack those targets. One of the regime's main targets has been and remains Ms. Alinejad.[1]

---

[1] During the time of the murder-for-hire plot against Ms. Alinejad, the IRGC was tasking Shakeri to exploit his network of criminal associates to find attackers targeting other victims, including Jewish individuals living in the New York area; Israeli tourists in Sri Lanka; and then-Presidential candidate Donald Trump. (*See* Final Presentence Investigation Report, dated January 14, 2026

Shakeri, Rivera, and Loadholt's efforts to kill Ms. Alinejad followed less than two years after a prior failed attempt on her life by the IRGC.  In 2022, the IRGC hired members of the Russian Mob to kill Ms. Alinejad, and one of those plotters—like Rivera and Loadholt—bought a firearm (in that case, an AK-47-style assault rifle) and regularly staked out the house in Brooklyn where Ms. Alinejad lived at the time with her family (the "Brooklyn Residence"), waiting for an opportunity to murder Ms. Alinejad when she exited the house.  That plot was disrupted by the FBI and publicly exposed by charges filed in January 2023.  Three of the Russian Mob leaders involved in the plot were arrested and later convicted.  *See United States v. Amirov et al.*, 22 Cr. 430 (CM).  The *Amirov* murder-for-hire plot itself followed thwarted efforts by an Iranian intelligence network in 2020 and 2021 to arrange for Ms. Alinejad's kidnapping from Brooklyn so that she could be brought to Iran for a show trial and, likely, execution.  *See United States v. Farahani*, 21 Cr. 430 (RA).

### A. Shakeri Pays Rivera and Loadholt to Target Ms. Alinejad at Fairfield University

In approximately December 2023 and January 2024, Shakeri paid another criminal associate ("CC-1"), with whom, like Rivera, Shakeri had also spent time in New York State prison, to locate the Brooklyn Residence and surveil it.  (PSR ¶ 25).

In February 2024, after obtaining photographs of the Brooklyn Residence[2] from CC-1, Shakeri turned to Rivera to carry out the murder and Rivera, in turn, enlisted his friend Loadholt.  (*Id.* ¶¶ 31-33).  Shakeri provided the defendants with a picture of Ms. Alinejad and the date and

---

("PSR") ¶ 73).  Shakeri in fact had one of his associates identify targets in Sri Lanka and take steps to procure AK-47s to carry out a mass shooting.

[2] The Brooklyn Residence is where Ms. Alinejad and her family lived at the time of the prior plots charged in *Amirov* and *Farahani*, but the family had, unbeknownst to the IRGC, moved out because of the threats to their lives and safety.

time of a public event where Ms. Alinejad was scheduled to speak at Fairfield University in Connecticut on February 15, 2024. (*Id.* ¶ 31). Shakeri also sent Rivera approximately $1,000 through Western Union, using payment intermediaries in the United Arab Emirates and elsewhere. (*Id.*). Loadholt and Rivera exchanged text messages about the assignment throughout the day prior to and the day of the scheduled event. (*Id.* ¶ 33). Rivera took screenshots of his messages with Shakeri (showing Shakeri's WhatsApp profile picture and phone number with a foreign country code) and sent them to Loadholt, including messages with the address of the university, the start time of the speaking event, and a Western Union receipt showing Shakeri's transfer (through an intermediary) of $500 to Rivera. (*Id.* ¶¶ 32-34).

Some of Loadholt and Rivera's communications about targeting Ms. Alinejad at the Fairfield University event, recovered from Loadholt's iPhone (seized during the search of his residence), are below:

| Date/Time (EST) | Sender | Receiver | Message |
|---|---|---|---|
| 2/14/2024 5:55:38 PM | Loadholt | Rivera | **U get half now half when u get the addy** |
| 2/14/2024 5:55:59 PM | Loadholt | Rivera | **Cause u need the gas and toll to get there** |
| 2/14/2024 6:19:56 PM | Rivera | Loadholt | Tomorrow |
| 2/14/2024 9:18:25 PM | Rivera | Loadholt | Tomorrow that bread is supposed to come in. If it does we out! I have everything we need.... |
| 2/14/2024 9:19:35 PM | Loadholt | Rivera | ***Liked "Tomorrow that bread is supposed to come in. If it ..."*** |
| 2/15/2024 6:37:20 AM | Rivera | Loadholt | I got 500 so far..... have to go to western union to pick it up though after I get to the island.... Leaving work early |
| 2/15/2024 6:37:45 AM | Rivera | Loadholt | Told Margie we were going to look at a bike for us in ct |

4

| Date/Time (EST) | Sender | Receiver | Message |
|---|---|---|---|
| 2/15/2024 10:02:11 !M | Loadholt | Rivera | **Yea** |
| 2/15/2024 1:25:54 PM | Rivera | Loadholt | On my way home<br>Now bro |
| 2/15/2024 1:26:01 PM | Rivera | Loadholt | Please be ready |
| | | | * * * |
| 2/15/2024 1:28:06 PM | Rivera | Loadholt | Only takes an hour to get there |
| 2/15/2024 1:28:34 PM | Rivera | Loadholt | Hour and 20 min |
| 2/15/2024 1:28:46 PM | Loadholt | Rivera | **Shoot the addy** |
| 2/15/2024 1:35:52 PM | Rivera | Loadholt | |
| 2/15/2024 1:37:08 PM | Loadholt | Rivera | **Yea we'll get 15$ taste for the ride nigga** |
| 2/15/2024 1:37:27 PM | Rivera | Loadholt | Yes sir |

5

Only a few days later, on or about February 23, 2024, Loadholt took pictures of two firearms, a Smith & Wesson and a compact Sig Sauer, which were recovered from his iPhone:

 

Using Loadholt's car, Rivera and Loadholt drove to Fairfield University on February 15, attempting to track Ms. Alinejad. (*E.g., id.* ¶35). The two men took the below-depicted photographs of the Fairfield University grounds, including a photograph that shows Rivera's face, and Rivera sent those pictures to Shakeri. (*Id.* ¶ 36).

  

Ultimately, however, Ms. Alinejad's speaking engagement was cancelled, and Rivera and Loadholt did not successfully track her to Fairfield University.

**B.      Rivera and Loadholt Stake Out Ms. Alinejad's Former Residence**

Though Rivera and Loadholt missed Ms. Alinejad at Fairfield University, they continued targeting her, hoping to catch and kill Ms. Alinejad at the Brooklyn Residence. (*See generally id.* ¶¶38-54). In March 2024, Shakeri sent Rivera another approximately $2,600, bringing the total to more than $3,100. (*Id.* ¶ 38). Multiple times that month—including March 3, 17, 23, 25, and 31— Rivera and Loadholt drove Loadholt's car from Staten Island to Brooklyn to stake out the Brooklyn Residence, usually for hours at a time. (*See id.* ¶¶ 39-49). For example, on March 3, Rivera took nearly two dozen pictures of the front of the Brooklyn Residence, including the front door and a car parked in the driveway, and sent several of these to Shakeri. (*Id.* ¶ 39).

Rivera and Loadholt used elaborate methods and operational security measures to conceal their activities: they changed out the license plates on Loadholt's car before arriving at the Brooklyn Residence and after leaving it to prevent the stakeout activity from being associated with the two men; they turned off their regular cellphones or left them at home in order to prevent an electronic record of their travels; and they used "burner" cellphones while on their stakeouts so they could communicate with Shakeri. (*See id.* ¶¶ 39-49). On March 17, 2024, Rivera bought a burner cellphone from a Staten Island cellphone store (Complaint ("Compl."), Dkt. 1 ¶ 31(m)), and, as shown in messages recovered from Loadholt's iPhone, texted Loadholt that same day that "I got the phone." Loadholt activated a burner phone on March 24, 2024: on that date, Loadholt received a T-Mobile Metro welcome message on a Samsung phone that was recovered by law enforcement from Loadholt's apartment. Images cached on this burner phone while Loadholt was viewing a map application the following day, March 25, 2024, show that Loadholt spent more than half an hour studying images of the Brooklyn Residence and the surrounding street and houses— paying special attention to an image of an NYPD vehicle parked outside the residence captured in the images, as well as the entrance and porch of the Brooklyn Residence.

Later that same day, Loadholt also viewed several images of Ms. Alinejad on the phone, which were saved to his camera app. Loadholt's burner phone contained publicly available images of Ms. Alinejad with file dates on March 25, April 4, and April 28, 2024, showing his efforts to identify her if he and Rivera successfully located her during their surveillance. Loadholt also stored the license plate number and make of a car parked in front of the Brooklyn Residence in a file dated March 25, 2024.

On March 31, 2024, Rivera and Loadholt exchanged messages about meeting up to go to the Brooklyn Residence; during the exchange, Loadholt texted Rivera: "Ok this phone is going out now," meaning that Loadholt was turning off his primary cellphone, for the likely purpose of preventing the phone's location from being tracked while Loadholt was surveilling what he believed to be Ms. Alinejad's home. (PSR ¶¶ 45, 48). Rivera and Loadholt then drove to stakeout the Brooklyn Residence. (*Id.* ¶¶ 48-49). After arriving at the Brooklyn Residence, where they sat in Loadholt's car several hours, Rivera and Loadholt exited the car only once and walked to a nearby bagel shop for food and coffee. (*Id.* ¶ 49). The two men did not give their real names for their orders and paid cash in order to avoid leaving a record of their presence there. (*Id.* ¶ 49). Later during the stakeout, Rivera, using his burner phone, texted Loadholt's burner phone about a police car on the corner down the block from the Brooklyn Residence: "Cop car on Marlboro and Dorchester[.]"

Rivera and Loadholt did not see Ms. Alinejad during their stakeouts in March. In a series of voice notes exchanged between Shakeri and Rivera on March 31, 2024, after Rivera and Loadholt's surveillance of the Brooklyn Residence earlier that day, Rivera and Shakeri aired their respective frustrations. (*Id.* ¶¶ 52-54). Shakeri emphasized that Rivera and Loadholt had failed to accomplish the job; Rivera described that he was frustrated with the difficulty of finding Ms.

Alinejad and Shakeri's failure to pay the defendants more money up front.  (*Id.*).  The two men

discussed how to carry the job out, ruling out a home invasion because of the risks, and agreeing

that the job would have to be done while Ms. Alinejad was out in public.  (*Id.*).  For example:

- In a voice note to Shakeri, Rivera stated, among other things, "this bitch is hard to catch, bro.  And because she hard to catch, there ain't gonna be no simple pull up, unless there the luck of the draw.  Unless there's the luck of the draw."  (*Id.* ¶ 51).

- In a voice note from Shakeri to Rivera on April 1, 2024, Shakeri told Rivera that Ms. Alinejad spent most of the time in a study on the third floor and a recording studio on the second floor.[3]  Shakeri went on to state, among other things, that "you just gotta have patience and don't, kicking, kick in the door is not an option because that's a fail, that's a fail maneuver.  You gotta wait and have patience to catch her either going in the house or coming out, or following her out somewhere and taking care of it.  Don't think about going in.  In is a suicide move."  (*Id.*)

- In a subsequent voice note, Rivera stated, among other things, that "we was here at night time, like 5:30 this morning, there was no fuckin' lights on . . .    I already know kickin' in doors only gonna to bring more attention.  We already know that, that part.  That neighborhood is too quiet for that type of shit.  Unless she's on the first floor, and you kick that shit in and then, then, you know, and let's assume you kick it in on the first try."  (*Id.* ¶ 52).

- In a subsequent voice note, Rivera stated, "If we can catch her walking through the door, that's something different.  Getting' out the car, that's easy.  Kickin' the fuckin' door in?  That ain't gonna work, bro.  That ain't gonna work.  Kickin' the door in's not gonna work."  (*Id.*).

- In a subsequent voice note, apparently responding to a message from Shakeri, Rivera stated:

  > What I'm sayin' to you in a nutshell, bro, is in order for this to get done?  And I don't give a fuck who is [U/I].  You say, "fuck you, nigga, I want somebody else."  Ok, your secret safe with me 'cause I ain't no snitch nigga, and I sure ain't no bitch nigga. So I can handle that, right.

Rivera thus assured Shakeri that if Shakeri decided to give the murder-for-hire job to someone

else, Rivera would not inform on Shakeri.  Rivera continued:

---

[3] Among other things, Ms. Alinejad recorded a Farsi-language news and satire program for Voice of America, which was sometimes recorded in part from home, as were other videos and interviews broadcast on Ms. Alinejad's social media.

> By the same token, you not gonna find too many motherfuckers who willing to take the job with receiving next to nothin' to start the job off with. You sent me thirty-one fifty, right? That pays for some tools and fuels, right? Tools and fuels that's being, the slammer, mostly, the slammer. Um, toll bridge fee, going back and forth. Putting gas in the car. Rentin' the car. Look, the car ain't mine bromie, that shit is bein' rented. It's funded by the thirty-one fifty. Shit ain't, know what I mean, niggas ain't just lettin' you hold their car to do a drive by for nothin', know what I mean, so. . . .

Rivera's reference to "money to start the job off with" meant a down payment in advance of completing the murder. His reference to "tools," which he also called a "slammer," meant a firearm. In this voice note, Rivera informed Shakeri, among other things, that Rivera and Loadholt had used $3,150 received by Rivera from Shakeri to buy a firearm, to pay travel costs, and to pay for the use of the car intended to be used in a "drive by," or a drive-by shooting.

> But homie, how long you think that's gonna last? How long can you expect two workin' niggas, or one workin' nigga, really me, but my man too, he a workin' nigga too. He not like, he's gonna sit out here all night, all day, rain, cold, sleet, on a promise. Let's be for real, we out here on a promise, from a nigga I know. Not even a nigga he knows, a nigga I know. But the less he knows, the better off you are. The less you know, the better off he is. Only thing y'all knew each other is through me.
>
> So, how far, realistically speaking, how far can a, will a nigga move, or how much will a nigga move on a promise? Niggas be like nah, I don't give a fuck how I know you, nah I ain't riskin' that. And he ask me, he said yo, how you feel about, how I feel about you. I say "yo, he's always been good people with me. He's always had good character to me. . . . If it was anybody else I'd say get the fuck out my face. Because it's him, and I know it's him, I'm tempted to believe him. I'm willing to give it a try for him."

(*Id.* ¶ 53). Rivera thus informed Shakeri that Rivera and Loadholt were willing to carry out the murder, including conducting the repeated, lengthy stakeouts of the Brooklyn Residence that had been required, without a larger up-front payment because of Rivera's trust in Shakeri. Rivera

10

described having persuaded Loadholt based on Rivera's vouching for Shakeri, even though Rivera did not reveal either man's identity to the other in order to protect each of them.

### C. Shakeri Prepares $100,000 to Deliver to Rivera if Rivera and Loadholt "Finish the Work"

A few days later, on April 19, 2024, Shakeri and Rivera discussed an additional payment of approximately $100,000 for Rivera and Loadholt to "finish the work." (*Id.* ¶ 55). On that date, Rivera messaged Shakeri to ask, "Are we still on? Is that a green light?" Shakeri later messaged Rivera that "I haven't talked to my man, I'm still travelling[.] The 100k is still there[.]" (*Id.* ¶ 56).

Rivera and Shakeri then exchanged a series of messages about arranging Rivera's collection of the $100,000. On April 19, 2024, after Shakeri told Rivera that the $100,00 was still there, Rivera responded that "I don't even have that dollar bill I sent u the pick of[.]"[4] (*Id.*). Shakeri then asked Rivera to send "another bill" on the "the other math," using "math" as slang for a phone number. (Shakeri, like Loadholt and Rivera, used multiple phone numbers). Neither Shakeri nor Rivera had cash on them, however, so Rivera sent a photograph of a book showing the ISBN number and asked Shakeri to use that number. (*Id.*).

Shakeri confirmed the ISBN number, and then told Rivera to "Finish the work, and pick up[.]" Rivera answered, "Nigga I wish it was that easy but I ain't no quitter[.]" (*Id.* ¶ 57). Shakeri later received a video of the Brooklyn Residence from "CR"—Carlisle Rivera—dated April 28, 2024, at approximately 6:11 p.m., confirming that Rivera and Loadholt returned to the house that day to attempt to kill Ms. Alinejad. (*Id.*).

---

[4] Rivera took a picture of a $1 bill on March 15, 2024, which was apparently intended to be used to receive a bulk cash delivery. The serial number of a dollar bill is frequently used for authentication in money laundering transactions or bulk cash deliveries to ensure that the intended person receives the money. The person delivering the money receives the serial number, and will only release the money to the person who has the bill with that serial number.

The data recovered from Loadholt's burner phone includes a video, dated April 28, 2024, of the front of the Brooklyn Residence taken from inside a car (dirt on the car window through which the video was taken can be seen, and the car's doorframe appears in portions of the video), showing that Loadholt and Rivera continued staking out the Brooklyn Residence.  (*Id.* ¶ 59).  The video is sideways and crooked, consistent with the person taking the video attempting to hide the fact that he was filming the house, and at various points zooms in on the car parked in the driveway and on the front door and porch.  (*Id.*).



Loadholt also texted Rivera a photograph of the Brooklyn Residence taken from inside a car and sent the message: "I'm still here."



### D. Shakeri, Rivera, and Loadholt Discuss the $100,000 Payment to "Take Care of It Already"

By July, Shakeri again discussed the payment of $100,000 for Rivera to "take care of it already." Rivera pressed Shakeri for the payment, writing, "What are we doing nigga? Waiting on u[.]" Shakeri responded that he had "just renewed the 100K," referencing the $100,000 Shakeri had previously offered Rivera to "finish the work," meaning to kill Ms. Alinejad. Shakeri then explained that he had "Been traveling" and his "schedule is hectic," before sending Rivera an apparently close-range image of Ms. Alinejad in workout attire lifting weights in a gym. He followed up, writing to Rivera, "Short was at the Gym today[,] In the city[.] I wish you can take care of it already," and "Just do it son, I'll handle the rest." (*See id.* ¶¶ 60-61).

After these communications between Shakeri and Rivera, in the evening of July 15, 2024 (Eastern time zone), Rivera sent Loadholt two screenshots containing this text messages exchange, including the discussion of the $100,000 and Shakeri's repeated insistence to "take care of it already," to "just do it," and "just get it done." The images below (redacted) were recovered from Loadholt and Rivera's text exchanges on Loadholt's iPhone:

13



The two then discussed between themselves payment for the murder plot. Immediately after sending the text message screenshots, Rivera asked Loadholt, "Got it?" After seeking additional clarification, Loadholt asked, "So no 10 up front I'm guessing??" conveying his understanding that the two would not receive an additional $10,000 up front to complete the job. Loadholt then expressed his dissatisfaction about not being paid, writing, "Yo wtf [what the fuck]" and "I'm screaming my head off ryt now[.]" (*Id.* ¶ 62).

Messages recovered from Loadholt's iPhone show that, despite this shared frustration about not getting a down payment, Loadholt and Rivera continued targeting Ms. Alinejad. Shortly after the exchange described above, Loadholt messaged Rivera: "Y'all gone have to up that price but git with me in the am." The following morning, Loadholt sent back to Rivera the screenshot showing a picture of Ms. Alinejad at the gym and asked, "Yo u burnin thru here nigga[?]" Rivera responded, "Be there in a few minutes[.]"

Approximately a week later, Loadholt photographed two Glock firearms that he possessed, resting on a clear plastic bin with his name written on it ("Jonathan"), and a Smith & Wesson with extended magazines and a barrel-mounted flashlight. These images, both dated July 22, 2024, were recovered from Loadholt's iPhone:

 

Additional photographs of two Glocks, dated July 28, 2024, were also recovered from Loadholt's iPhone, this time showing a compact Glock with an extended magazine:

 

### E.    Rivera and Loadholt Are Arrested

In the early morning hours of November 7, 2024, Rivera and Loadholt were arrested at their respective residences. Their apartments were also searched pursuant to search warrants. At

Rivera's residence, law enforcement agents recovered, among other things, a firearm with a partially obliterated serial number, which is depicted below.  (PSR ¶77).



At Loadholt's residence, law enforcement agents did not find the firearms Loadholt had possessed earlier that year,[5] but recovered approximately 50 rounds of .22 caliber bullets, 25 rounds of .40 caliber bullets, and one .45 caliber bullet.

  

.40 caliber Smith & Wesson ammunition                .22 caliber ammunition

---

[5] Text messages from late July 2024 recovered from Loadholt's iPhone show he was attempting to sell two firearms for $900 and $500.  Loadholt's iCloud account also contains photographs of firearms, photographs showing Loadholt's hand gripping the firearm, dated between 2018 and 2024.  The firearms shown include a Taurus G2s 9mm firearm (a subcompact handgun designed for easy concealed carrying); a Smith & Wesson M&P pistol; a Smith & Wesson .380 pistol (a compact handgun designed for easy concealed carrying); an assault rifle; and a 9mm pistol with the serial number scratched off.  (Compl. ¶ 29(a)).



.45 caliber ammunition

The agents also found a jar of marijuana, two large baggies of marijuana, and two bags filled with materials for packaging marijuana.[6]

  

Marijuana baggies and Mason jar

 

Bagging and packaging materials for marijuana

---

[6] Loadholt's iCloud account, searched pursuant to search warrant, also contained photographs relating to marijuana distribution, including photographs of marijuana and pictures of scales.

## II.    The Charges

On November 8, 2024, the Complaint was filed, charging Rivera and Loadholt with murder for hire, conspiring to commit murder for hire, and conspiring to commit money laundering. Shakeri was charged with those offenses, as well as providing and conspiring to provide material support to a designated foreign terrorist organization, the IRGC.

On December 5, 2024, an indictment was filed charging the same offenses as the Complaint.  (Dkt. 4).

## III.    Loadholt's Guilty Plea

On January 15, 2026, Loadholt pled guilty, pursuant to a plea agreement, to a two-count Superseding Information, S2 24 Cr. 670 (LJL), Dkt. 53.  Count One charges Loadholt with stalking Victim-1, *i.e.*, Ms. Alinejad, in violation of 18 U.S.C. § 2261A.  Count Two charges Loadholt with conspiring to launder money, in violation of 18 U.S.C. § 371.  Counts One and Two have a total statutory maximum term of imprisonment of 120 months' imprisonment.

The plea agreement sets forth the Government's calculation of the application of the Sentencing Guidelines, although Loadholt did not stipulate to that calculation.  According to the Government's calculation, Guidelines Section 2A6.2 applies to Count One. Pursuant to § 2A6.2(c)(1), because the stalking offense involved another criminal offense, the base offense level is determined by the application of the offense Guideline most applicable to the other offense. The other offense involved in Count One is conspiracy to commit the murder of Ms. Alinejad, to which Guidelines Section 2A1.5 applies.  Pursuant to § 2A1.5(a), the base offense level is 33 and, because the offense involved the offer or receipt of something of pecuniary value for undertaking the murder, four additional levels are added pursuant to § 2A1.b(b)(1), resulting in a total offense level for Count One of 37.  (Plea Agmt. at 2-3).

Guidelines Section 2S1.1 applies to Count Two. Pursuant to § 2S1.1(a)(2), the base offense level is 8, plus 2 levels from the application of the table in § 2B1.1 corresponding to the value of the funds laundered. Because subsection (a)(2) applies and the defendant knew or believed that the laundered funds were intended to promote an offense involving firearms, *i.e.*, the murder of Ms. Alinejad using a firearm and the stalking of Ms. Alinejad using firearms, 6 levels are added pursuant to § 2S1.1(b)(1). Accordingly, the total offense level for Count Two is 16.[7] (Plea Agmt. at 3).

After grouping, the combined offense level for Counts One and Two is 37. Adjusting for the defendant's acceptance of responsibility through a timely plea pursuant to § 3E1.1, the applicable Guidelines offense level is 34. (Plea Agmt. at 3).

Loadholt has four prior convictions, in 2006, 2007, 2008, and 2011 for insurance fraud, criminal possession of stolen property in the fifth degree, unlicensed operation of a motor vehicle in the third degree, and robbery in the second degree. With respect to the robbery offense, Loadholt and three others approached two victims from behind, demanded money, and produced what appeared to be a black handgun that was pointed at the victims. (PSR ¶ 99). Following his arrests for both robbery and for possession of stolen property, Loadholt twice told officers that he was "in the wrong place at the wrong time" and was "around the wrong people at the wrong time." (*Id*. ¶¶ 99, 100). These convictions do not result in any criminal history points, and the defendant's Criminal History Category is I. (PSR ¶¶ 97, 102; Plea Agmt. at 3-4).

---

[7] The Plea Agreement further added two levels pursuant to § 2S1.1(2)(b), which applies when the defendant is convicted under 18 U.S.C. § 1956. However, Count Two does not charge a violation of § 1956, but rather charges that a violation of § 1956 is the object of a conspiracy under § 371. Accordingly, this two-level enhancement does not apply.

19

With an offense level of 34 and a Criminal History Category of I, the Guidelines sentencing range is 151 to 188 months' imprisonment, which, applying the combined statutory maximum of 10 years and § 5G1.1(a), results in a sentencing range of 120 months' imprisonment. (*Id.*).  The applicable fine range is $35,000 to $350,000.  (*Id.*).[8]

At his change-of-plea hearing, Loadholt admitted committing the crimes of stalking and money laundering.  With respect to the stalking offense, Loadholt allocuted, under oath, that:

> I agreed with another person to stalk a victim. To that end, I used a cell phone and electronic messaging application in furtherance of the scheme to locate and surveil the victim with the intent to intimidate or harass. I understood that my conduct would reasonably be expected to cause her substantial emotional distress.

(Jan. 15, 2026 Tr. at 27).  With respect to the money laundering conspiracy, Loadholt allucated that:

> I agreed with another person to engage in money laundering. We agreed to receive money in the United States from someone in a place outside the United States in an amount exceeding 10,000, with the intent to promote the crime of firearms trafficking. Specifically, I understood that a co-conspirator planned to use some of the money to unlawfully purchase a gun.

(*Id*. at 28).  Loadholt further acknowledged that:

(i)  he surveilled an address belonging to the victim in furtherance of the money laundering conspiracy (*id*. at 29),

(ii) the money laundered into the United States was payment for surveillance of the victim, and

(iii) some of the money was to be used by a co-conspirator (*i.e.*, Rivera) to purchase a firearm.  (*Id*. at 32-33).

---

[8] Although the defendant did not stipulate to the Guidelines calculation in the Plea Agreement, he agreed not to appeal any sentence within the sentencing range provided in the agreement. (Plea Agmt. at 5.)

**IV.    Rivera's Plea and Sentencing**

October 17, 2025, Rivera pled guilty, pursuant to a plea agreement, to a two-count Superseding Information, S1 24 Cr. 670 (LJL), to one count of conspiring to commit murder for hire in violation of 18 U.S.C. § 1958 and one count of conspiring to commit stalking in violation of 18 U.S.C. §§ 371 and 2261A(2).  (Dkt. 46).  The victim of both the murder-for-hire conspiracy and stalking conspiracy was Ms. Alinejad.

On January 26, 2026, this Court sentenced Rivera principally to a term of imprisonment of 180 months' imprisonment, the statutory maximum.

**V.    The Presentence Report**

Probation issued the PSR, which agrees with the Guidelines calculation set forth in the Plea Agreement.  (PSR ¶¶ 82-102, 139-150).  Probation recognized that this offense is Loadholt's fifth criminal conviction (PSR at 48) and that the offense is serious, "involv[ing] deliberate acts committed by the defendant and the and his cohorts to stalk with an intent to murder a victim in exchange for a large sum of money." (*Id*. at 29).  In recommending a below-Guidelines sentence of 72 months' imprisonment, Probation reasons that Loadholt appears to have been comparatively less culpable and was recruited into the plot by his co-defendant Rivera.  (*Id*.).

**A.    Loadholt's Objections to the PSR**

The defense makes a number of unwarranted objections to the PSR.  In general, the defense's proposed amendments seek to deemphasize the defendant's role in the offense or otherwise strip appropriate context from the PSR.  Accordingly, for the reasons set forth below— with the exception of the defendant's objection to Paragraph 52, to which the Government does not object—the Court should reject the defendant's objections.

- Paragraphs 6-10: Paragraphs 6 through 10 of the PSR provide information about the status of defendants charged in a related case, *United States v. Amirov, et al.*, 22 Cr. 438 (CM).  Defense counsel objects to the inclusion of this information in the

21

PSR because, he argues, this information does not bear on the Court's evaluation of the § 3553(a) factors as to the defendant; rather, this information "invites the Court to view Mr. Loadholt's conduct through the lens of other cases rather than on its own terms." (Loadholt Sent. Mem. at 7-8). This is wrong. Courts routinely consider the status of co-defendants and related cases in imposing sentence. That is in line with § 3553(a)'s directive that the sentencing court consider, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). As set forth above, the unsuccessful murder plot in *Amirov* predated the one undertaken by the defendant, along with Rivera and Shakeri, and is important both as context and comparator to the Court's sentencing of the defendant. In particular, this information is useful in evaluating the seriousness of the offense, *see* 18 U.S.C. § 3553(a)(2)(A), because the related case underscores the dangerousness and clear intent of the murder plot in which the defendant participated—and that it followed an unsuccessful attempt by members of the IRGC and the Russian Mob to kill Ms. Alinejad. Finally, the defense argument presupposes that the Court will not consider this information for what it is: to assist the Court in contextualizing and benchmarking the sentence to be imposed on the defendant, and to evaluate the value of general and specific deterrence. Accordingly, the Government respectfully submits that the Court should overrule the defense's objection to Paragraphs 6 through 10 of the PSR.

- Paragraph 21: Paragraph 21 of the PSR includes, in relevant part, that "The IRGC tasked Shakeri to use the Shakeri Network, particularly Rivera **and Loadholt**, as well as others known and unknown, to locate, surveil, and kill [Ms. Alinejad]." The defendant objects to the inclusion of the bolded portion in that sentence because, according to the defense, "including Mr. Loadholt as part of the 'Shakeri Network' implies a level of culpability the record does not support." (Loadholt Sent. Mem. at 8). While the defense may wish to argue that the defendant bears a lower level of culpability than Shakeri and Rivera, he does not, and cannot, dispute that he was a member of the group of criminal associates tasked with surveilling and, ultimately, killing Ms. Alinejad. As set forth at Paragraph 17 of the PSR, the "Shakeri Network" simply refers to "a network of criminal associates that [Shakeri] met during his time in prison to supply the IRGC with operatives to conduct surveillance and assassinations of IRGC targets[.]" PSR ¶ 17. Paragraph 17 makes clear that group included Rivera, as well as the defendant, described as "an associate of Rivera," and others. *Id.* The "Shakeri Network" is simply a descriptive term meant to refer to the group of criminal associates who worked together toward the aim of surveilling and killing Ms. Alinejad. The Government does not contend that the defendant was a friend of Shakeri's or in direct communication with him; rather, as is clear from the PSR, the defendant was an associate of Rivera's, who had a longstanding relationship with Shakeri. Neither the PSR nor the Government's prior filings are ambiguous on that point, and the defense's objection to Paragraph 21 should be rejected.

22

- Paragraph 52: Paragraph 52 of the PSR states, in relevant part, that "It appeared that Rivera sent the voice notes on March 31, 2024, while Rivera and Loadholt were surveilling the Brooklyn Residence." Consistent with the Complaint, the Government does not allege that the defendant and Rivera exchanged voice notes with Shakeri *while they were together* conducting surveillance of the Brooklyn Residence on March 31, 2024. *See* Compl. ¶ 33(ff), n. 9. Rather, as the defense and Government have discussed, the evidence shows that Shakeri and Rivera exchanged voice notes on March 31, 2024, which was one of the days on which the defendant and Rivera conducted surveillance of the Brooklyn Residence. To resolve any ambiguity, the Government does not object to the defense's request to delete from this paragraph, "while Rivera and Loadholt were surveilling the Brooklyn Residence."

- Paragraph 58: Paragraph 58 of the PSR states, in relevant part, that "as described in further detail below, Shakeri's failure to disclose information about Rivera **and Loadholt** to the FBI during telephonic interviews, despite that information being directly and obviously responsive to several questions that were posed to him, further showed that 'finishing the work' meant murdering [Ms. Alinejad]." The defendant objects to the inclusion of the bolded portion, arguing that "there is no evidence that Shakeri knew Mr. Loadholt's name or had other material information about him." (Loadholt Sent. Mem. at 8). The defense's objection is carefully worded to elide basic facts and misses the point. The defense does not contest either that Shakeri knew of the defendant's existence or that he had information about him; just that Shakeri did not know the defendant's *name* or have any, according to the defense, *material* information about the defendant. It is clear based on, for example, the voice notes exchanged by Shakeri and Rivera that Shakeri was aware that Rivera had enlisted an associate to assist with the plot to surveil and murder Ms. Alinejad. *See, e.g.*, PSR ¶ 53 ("How long can you expect two workin' niggas, or one workin' nigga, really me, but my man too, he a workin' nigga. He not like, he's gonna sit out here all night, all day, rain, cold, sleet, on a promise. Let's be for real, we out here on a promise, from a nigga I know. Not even a nigga he knows, a nigga I know. But the less he knows, the better off you are. The less you know, the better off he is. Only thing y' all knew each other is through me…."). The reason Shakeri did not know the defendant's name, which is the basis for the defense's objection, was *by design*. It was intentional. That Shakeri knew Rivera had an associate, whom Shakeri had promised to pay (along with Rivera), is certainly "material" information he failed to disclose. Accordingly, the defense's objection to Paragraph 58 should be rejected.

- Paragraph 71: Paragraph 71 of the PSR states, in relevant part, that "[d]uring the interview, Shakeri also stated that Rivera had an associate **who was working with Rivera**, but Shakeri did not provide that individual's name." The defense objects to the bolded portion of the sentence and requests that this is inaccurate because "Mr. Loadholt's participation was limited to surveillance[.]" (Loadholt Sent. Mem. at 9). As a threshold matter, this paragraph describes what Shakeri said during this interview, which is accurately stated by the PSR. Shakeri said, consistent with the

23

voice notes he exchanged with Rivera, that Rivera had another associate working with him. Shakeri did not cabin the associate's involvement to "who he used for surveillance purposes." Moreover, and in any event, such a statement—even if that is what Shakeri said, which it is not—is contradicted by the record, including the defendant's guilty plea to a conspiracy to commit money laundering, in which he admitted, among other things, that "I understood that a co-conspirator planned to use some of the money to unlawfully purchase a gun." (Pl. Tr. at 28). Accordingly, the defense's objection to Paragraph 71 should be rejected.

- Paragraphs 72-75: The defense objects to the inclusion of Paragraph 72 through 75, which describe the Shakeri Network's plots against Victims-2, -3, and -4. The defense argues, similarly to Paragraphs 6 through 10, that "[t]he matters discussed have no bearing on the guidelines calculation, § 3553 factors, or any legitimate sentencing consideration." (Loadholt Sent. Mem. at 9). Again, the defense ignores the context in which this plot took place, which is an appropriate consideration at sentencing. The Government does not allege that the defendant had any involvement in the plots targeting Victims-2, -3, or -4. However, the fact that the Shakeri Network was actively engaged in other assassination plots, in addition to the one targeting Ms. Alinejad, serves to underscore the seriousness and immediacy of the threat posed by the defendant, Rivera, and Shakeri to Ms. Alinejad. The defendant was an active participant in a murder plot and the broader context is relevant, at a minimum in evaluating the clear intent of the plot to murder Ms. Alinejad and in view of any attempt to suggest that was not the clear aim. Accordingly, the defense's objection to Paragraphs 72 through 75 should be rejected.

- Paragraph 76: The defense's objection should be rejected for substantially the same reasons set forth above with respect to Paragraphs 21 and 58.

- Paragraph 77: Paragraph 77 of the PSR states, in relevant part, that the defendant, "was determined to be responsible for conspiring to commit money laundering with respect to funds sent by Shakeri from overseas using payment intermediaries in the United Arab Emirates and elsewhere, **in order to purchase**, among other things, a firearm which was intended to be used to carry out the instance offense . . . ." The defense requests that the bolded language should be amended to read "in order for **Rivera** to purchase." (Loadholt Sent. Mem. at 9). This proposed revision is unnecessary and unwarranted. The PSR is accurate as written: Shakeri sent money; the defendant pled guilty to conspiracy to commit money laundering; and part of that money was sent by Shakeri to purchase a firearm. That, as the defendant admitted at his change of plea hearing, was one of the aims of the money laundering conspiracy—whether Shakeri intended specifically that Rivera, or someone else, purchase the firearm is not at issue in this paragraph. Accordingly, the defense's objection to Paragraph 77 should be rejected.

24

### B.    Loadholt's Objections to the Guidelines Calculation

Loadholt also objects to the PSR's Guidelines calculation, which is in accord with the Government's calculation in the plea agreement. (Loadholt Sent. Mem. at 9-11).  Loadholt does not dispute that § 2A6.2 applies to Count One, but argues that, under subsection (c)(1), the "[]other criminal offense" that was involved in the stalking is money laundering, not murder for hire.  This argument is wrong on two counts: first, the stalking involved a murder-for-hire conspiracy, because the purpose of the stalking was to carry out a murder in exchange for money.  Second, even if the stalking involved both murder-for-hire conspiracy and money laundering, § 2A6.1(c)(1) directs the Court to apply the Guideline for another offense "if the resulting offense level is greater than that determined above," which only applies to the murder conspiracy Guidelines.

The other criminal offense that was involved in the stalking was murder-for-hire conspiracy. Stalking requires that the defendant (1) use a facility of interstate or foreign commerce (2) in a course of conduct that caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress to the victim; and (3) acted with the intend to kill, injure, harass, or intimidate the person.  18 U.S.C. § 2261A(2)(B).  Loadholt committed stalking by, among other things, repeatedly staking out locations in Connecticut and Brooklyn where Ms. Alinejad was believed to be, photographing and videoing those locations, and possessing or procuring firearms, all with the intent that Ms. Alinejad be located and killed—in other words, murder for hire.  The money laundering conduct, in contrast, was not part of the elements of the stalking offense.  The money laundering facilitated the stalking, but was not the purpose of the stalking.  Accordingly, Probation correctly applied § 2A1.5. *See, e.g.*, *United States v. Buonocore*, No. 23-11728, 2024 WL 4003024, at *3 (11th Cir. Aug. 20, 2024) (*per curiam*) (district court correctly applied the sexual abuse Guideline pursuant to § 2A6.2(c)(1) the defendant stalked the underage victim for the purpose of causing someone to engage in sexual contact with her); *United*

25

*States v. Douglas*, 646 F.3d 1134, 1138 (8th Cir. 2011) (district court correctly applied the kidnapping Guideline pursuant to § 2A6.2(c)(1) because the defendant committed domestic violence against the victim as part of a kidnap); *United States v. Nicolella*, 211 Fed. App'x 12, 14 (1st Cir. 2007) (per curiam) (same).

Even if both murder-for-hire conspiracy and money laundering were involved in the stalking offense, the murder conspiracy Guideline would apply because only it results in an offense level greater than the offense level determined under § 26A.1(a)and (b). Under those subsections, the offense level would be 22: a base offense level of 18 plus 4 additional levels because the offense involved the "possession, or threatened use, of a dangerous weapon" and ("a pattern of activity involving stalking . . . the same victim." Applying the money-laundering Guideline results in an offense level of 16, *supra* at 19, n.7, which is lower; applying the murder conspiracy Guideline results in an offense level of 37, which is higher. Accordingly, § 2A6.2(c)(1) requires the application of the murder conspiracy Guideline.

## DISCUSSION

A sentence of 120 months' imprisonment is appropriate to reflect the nature and seriousness of the offenses, to account for the history and characteristics of the defendant, to provide just punishment, and to afford both specific and general deterrence. *See* 18 U.S.C. § 3553(a). Such a sentence would appropriately account for the defendant's role in the offenses and his relative culpability, and the defendant's arguments to the contrary should be rejected.

### A. The Nature and Seriousness of the Offense

The seriousness of the offenses amply supports a within-Guidelines sentence of 120 months' imprisonment. The offense conduct is among the most serious of crimes. *See* 18 U.S.C. § 3553(a)(2)(A). Loadholt agreed to murder someone he did not know for money. That someone, Ms. Alinejad, is an author, journalist, and human rights advocate who plays a prominent and critical

role in the Iranian populace's struggle for civil rights, for basic political freedoms, and for liberty from a tyrannical theocratic dictatorship that oppresses its citizens with arbitrary arrests and detention, torture, beatings, and gunfire. Loadholt may well have had no idea of Ms. Alinejad's journalistic and human rights efforts, or that his ultimate client was the Government of Iran, seeking to silence a critic for exercising her freedoms of speech and political activity. But even so, there is no indication it would have mattered to him. Loadholt's goal was to kill his victim for money.

Indeed, that is part of what makes Loadholt's crimes particularly heinous and dangerous. By signing on to the plot to stalk, obtain a firearm, and, ultimately, kill Ms. Alinejad—who Loadholt did not know—Loadholt effectively rendered himself a mercenary. He therefore the dangerousness of the client—here, the IRGC—by making the murder plot more difficult to detect and disrupt, more difficult to investigate, more difficult to trace back to the person or entity providing the targeting and the money and the direction. Loadholt, an American citizen, became a tool of a hostile foreign government seeking to eliminate an opponent, who fled Iran precisely to escape such violent retribution. But because of Loadholt's willingness to join a plot to stalk and murder, Ms. Alinejad was put in mortal danger in her adopted home in the United States. Loadholt's ignorance and indifference to his victim and his client is an aggravating factor warranting a serious punishment.

Loadholt argues that "Rivera never asked him to commit murder" (Loadholt Sent. Mem. at 6) but notably does *not* contest that Loadholt knew that the purpose of attempting to locate Ms. Alinejad was to execute her murder. Indeed, regardless of whether Loadholt would be the trigger-puller, he clearly was a full-fledged member of the plot to murder Ms. Alinejad, devoting countless hours to efforts to locate her and coordinating closely with Rivera throughout the plot. Loadholt

27

was actively engaged in attempting to locate Ms. Alinejad from at least February 2024, when he and Rivera drove in Loadholt's car all the way to Connecticut in an attempt to catch Ms. Alinejad at a public speaking event, until at least the end of April 2024, when Loadholt staked out the Brooklyn Residence and took video and photograph surveillance of the house.  He and Rivera continued to discuss efforts to find Ms. Alinejad for several more months, including in response to Shakeri's pushing them to find her in July and his renewed promise of $100,000 for "tak[ing] care of it."  Loadholt and Rivera discussed the photograph of Ms. Alinejad at a gym and meeting up in July to continue their efforts to locate—and kill—her.

Loadholt supplied his car, his time, and his effort to locate and assist in murdering Ms. Alinejad—which was planned for when she was entering or leaving either her house or her car, as Rivera described to Shakeri in their exchange of voice notes.  Loadholt used multiple license plates in an attempt to conceal the car's travel back and forth to the Brooklyn Residence.  Loadholt, like Rivera, procured a burner phone to hide his travel to the Brooklyn Residence, and turned off his regular phone or left it behind in his apartment.  Loadholt took pictures of publicly available images of Ms. Alinejad to help identify and locate her.  Loadholt possessed firearms while engaged in the murder-for-hire plot, which are shown in multiple photographs taken on his phone and stored on his phone and cloud accounts; as well as ammunition, which was recovered from the search of his house.  These materials make clear, like the plot itself, that the potential harm Loadholt posed to Ms. Alinejad was real and immediate.

Both Loadholt and Probation argue that Loadholt's involvement in the plot was of a lesser nature than others' involvement.  The Government agrees: Shakeri, not Loadholt, knew that the planned murder was for the IRGC, a terrorist organization; Rivera, not Loadholt, had a longstanding relationship with Shakeri and direct communications with him—though Rivera

28

shared those communications with Loadholt, as shown in screenshots of Rivera's and Shakeri's text messages that Rivera sent to Loadholt; and Rivera recruited Loadholt into the plot, not the other way around. However, those relative differences in responsibility and knowledge already are reflected in the Plea Agreement, in comparison to the one the Government offered to Rivera. Rivera pleaded guilty to an information charging offenses with an aggregate statutory maximum of 180 months' imprisonment. Loadholt pleaded guilty to an information charging offenses with an aggregate statutory maximum of 120 months' imprisonment, which also reduces his Guidelines sentencing range from 151 to 188 months' imprisonment to 120 months, or a 20.5% reduction from the bottom of the otherwise-applicable Guidelines range. Probation and Loadholt's proposed sentence would represent a reduction of at least approximately half from the bottom of the otherwise-applicable Guidelines range, an extreme form of leniency that would in no way reflect the seriousness of the offense of Loadholt's extremely culpable role in it.

## B. The Need to Afford Adequate Deterrence

While Loadholt was ignorant of, and indifferent to, the geopolitical backdrop of the Government of Iran's continued targeting of Ms. Alinejad as part of its campaign of brutally stamping out dissent in Iran and abroad, the fact that he joined a murder plot that was part of that targeting highlights the strong need for deterrence. This murder-for-hire plot represents the third time in approximately five years that the Iranian regime has attempted to silence Ms. Alinejad on American soil. The regime initiated the *Amirov* murder plot even though the *Farahani* kidnapping plot had been disrupted and publicly exposed through charges filed in this District. Then, even after the *Amirov* plot was similarly thwarted through arrests, extraditions, and public charges, the IRGC switched criminal networks and pressed ahead through Shakeri.

Loadholt and Rivera's participation in this plot represents an exceedingly dangerous evolution of the threat to Ms. Alinejad, as well as to other dissidents and opponents of the Iranian

29

regime.  In *Farahani*, members of an Iranian intelligence network directly contacted New York private investigators under false pretenses to obtain surveillance and intelligence on Ms. Alinejad in furtherance of the kidnapping plot; in *Amirov*, the IRGC introduced an intermediary, removing itself by one degree, and hired an organized criminal proxy group, the Russian Mob, to do their dirty work; here, the IRGC used a criminal network of American citizens to try to find and kill Ms. Alinejad, greatly increasing the IRGC's ability to operate inside the United States and to hide the IRGC's fingerprints on the murder plot.  By using criminal networks inside other countries through connected criminals like Shakeri and his associates, including Rivera and, in turn, Rivera's associate Loadholt, the IRGC is able to promote violence against its priority targets, like Ms. Alinejad, and also seek out other targets of opportunity, like the Shakeri network's targeting of Jewish businessmen and Israeli tourists.  A strong sentence is needed here to send the message to criminal networks—and to individual criminals, like Rivera—that working with the Iranian regime is a path to a lengthy incarceration.  *See* 18 U.S.C. § 3553(a)(2)(B).

### C.  The History and Characteristics of the Defendant

Loadholt's history and characteristics further demonstrate the need for a 120-month sentence.  This is Loadholt's fifth criminal conviction.  He has a history of theft and robbery, including offenses involving firearms, that stretches back 20 years.  It is true that Loadholt has not, prior to the instant conviction, been convicted of an offense since 2011, when he was 22. But that history nonetheless did not dissuade Loadholt from becoming a full-throated member of a murder-for-hire plot when the prospect of $100,000 presented itself.  Nor did it dissuade him from the other offenses revealed in the course of this investigation, including trafficking in controlled substances, possessing firearms and ammunition after felony convictions, and firearms trafficking. In sum, Loadholt's history and characteristics support a significant sentence.

30

**D.      The Defendant's Sentencing Arguments Do Not Support a Variance**

The defendant's other arguments fall far short of justifying the below-Guidelines sentence he seeks.

Loadholt argues for the imposition of concurrent, rather than consecutive, sentences, relying on the sentence imposed in *Amirov*. (Loadholt Sent. Mem. at 13). In *Amirov*, however, the court imposed a 25-year sentence of imprisonment for a case involving a murder-for-hire plot against Ms. Alinejad, much higher than the statutory maximum Loadholt faces for participating in a similar offense. Artificially limiting Loadholt's sentence to five years would create an unwarranted sentencing disparity. Loadholt's argument is also contradicted by the Guidelines, which provide that sentences on multiple counts should be imposed consecutively if required to produce a combined sentence equal to the total punishment that the Court concludes is appropriate. *See* U.S.S.G. § 5G1.2(d).

Loadholt also argues that he does not pose a risk of future danger to the community. (Loadholt Sent. Mem. at 14). This argument is contradicted by Loadholt's criminal history, his involvement in this offense, and his distribution and possession of controlled substances, firearms, and ammunition. Loadholt signed on with Rivera, a convicted murderer, to, at a minimum, stalk Ms. Alinejad and use money sent from overseas to purchase a gun. That, in his own telling, he did not know the client (the IRGC) or the victim (Ms. Alinejad), means he was willing to commit serious crimes against a stranger for an unknown benefactor; hardly a sign that he would not commit additional crimes in the future. Moreover, Loadholt has not been deterred by his multiple prior criminal convictions, and a substantial sentence is warranted to provide specific deterrence. Equally importantly, a substantial sentence is required to reflect the seriousness of the offense, to promote respect for the law, and to afford general deterrence.

Loadholt further argues that his sentence need to consider general deterrence because the sentence imposed on Rivera and others is sufficient to afford general deterrence. (*Id*. at 16). In effect, the defense argues that, because Rivera was sentenced before Loadholt, the need for deterrence has abated. But Loadholt asks the Court to seriously undermine the deterrent value of those sentences by imposing a fractional sentence on Loadholt. The serious sentences imposed on Rivera, Amirov, and Omarov do not warrant reduction of Loadholt's sentence, which would both undermine general deterrence and create unwarranted sentencing disparities.

Finally, Loadholt argues that his family needs his financial and emotional support (*id*. at 14-15), but offers little individualized support for that argument. From Loadholt's reported employment history, he has not been a significant source of legitimate financial support, and the investigation has revealed that Loadholt committed felonies in the apartment where he lives with his partner and child—possessing controlled substances, paraphernalia for packaging and selling controlled substances, firearms, and ammunition. The needs of his partner and child did not dissuade Loadholt from engaging in those crimes in addition to the murder-for-hire plot and it is disingenuous for him to rely on them as a mitigating factor now.

## CONCLUSION

For the foregoing reason, the Government respectfully requests that the Court sentence Rivera to a term of imprisonment of 120 months' imprisonment.

Dated:  May 20, 2026
       New York, New York

JAY CLAYTON
United States Attorney


By: _____/s/_____
      Jacob H. Gutwillig
      Michael D. Lockard
      Assistant United States Attorneys